Please be seated. Thank you. Please call the next case. Counsel, you may proceed. Good morning, Your Honors. My name is Tracy Jones and I represent Mark Talbert, the appellant and employee in this case. This file came to me in the same manner that you reviewed it. I got involved after the trial was done, after the appeal, and after all the briefs have been done. So in looking at this record, I'm looking at it in the same manner that you did, reviewing all the evidence, reviewing the Commission's decision, reviewing the arbitration decision. And for the life of me, I can't understand how they arose at the decision they came to. Not only does the manifest rate in this record compel a different result, but there's no evidence to support what the Commission found in this case. We had the two doctors, and you said we have the treating physician, Norris, and now we have Dr. Farah, ostensibly support that the claimant's condition was the result of the histoplasmosis, correct? Correct. The Commission seemed to go, then, this doctor, how do you pronounce the bride, begins with a B? I don't know. I'm assuming Brunchan, but we'll just call him the IME. Okay, so they relied on his, ostensibly relied on his documents, his testimony, to go contrary to the claimant's position. So can you point us to some infirmities in Brunchan's position? Yes. I actually disagree with you that the Commission relied on the IME opinion. The Commission didn't rely on his opinion in order to deny compensability. What the Commission did was, first, said that on the date of accident, there was no exposure and there was no employee-employee relationship. And then they went and addressed causation. And what the Commission did, which is not what was done by the arbitrator, but an added bit in the Commission's decision, was say, he failed to prove that he actually was exposed to bird feces resulting in the histoplasmosis while working on this job. The Commission required him to present some evidence that he actually was exposed to bird droppings. Dr. Brunchan, in his report, actually said that the histoplasmosis is more likely than not related to the exposure that occurred while working, emptying the corn and this old material from these grain bins. So the IME actually supports causal connection. There's not a single medical opinion in this record that says, Does the Commission, in essence, misinterpret Brunchan's testimony? They read into it what wasn't there. Brunchan's report is practically incomprehensible, right? I agree with you. I mean, there's no testimony. There's no other records. It's a four-paragraph, two-page report complete with multiple misspelled words and incomplete, incomprehensible sentences. Do you agree with that? Absolutely. And, you know, in particular, the Commission quoted one incomplete sentence and misinterpreted it about breeding sites. It did. Neither the IME letter in that sentence or the Commission's use of it makes any sense, does it? No. And, in fact, when I read this report again last night, I was looking at the last sentence on page one and reading on page two, and I swore there was a page missing from here because it doesn't make any sense whatsoever. Well, in addition, I mean, we, I mean, this is an IME in Davenport, Iowa. We don't know what records he examined because he doesn't say what they are. He appears to be answering questions from, it's written to an insurance company. It is. It's written to the claims lawyer. He doesn't set out what the questions are, so we really, it's kind of hard to tell what he's even talking about. It is. And it's hard to tell what he understood even the guy to be doing when he was working there, or the dates upon which he was working relative to when his treatment was and when he wrote this opinion. But he does state, quote, it is probably true that his current condition is usually connected with his employment. Close quote. That's correct. And that's an opinion that supports causal relationship in this matter. And that echoes that of Dr. Fara, the pulmonologist, and Dr. Norris. Now, Dr. Fara and Dr. Norris had clearly understood what his job was, how long he did it, what he was exposed to, and what his resulting symptoms and treatment were. And they said, yes, this histoplasmosis in this patient is directly related to the exposure at work. So from a medical standpoint on causal relationship, there is absolutely no evidence to support the commission's decision. So we turn then to the issue of accident date and employer-employee relationship, which I think the commission at least did a little better job explaining what they were saying. Here's what they did. They accepted that the accident date was October 4, 2010, which was the date alleged by the petitioner on the application for adjustment of claims. It was the date the petitioner testified was the date he understood his condition to be work-related. And what the commission said is two things. Number one, he wasn't working on that day, so he didn't have any actual exposure to the bird droppings on that date. And two, because he was not an employee on October 4, they couldn't find that it was a compensable accident. This is not a specific trauma case. This isn't like the Surdy service case that's cited in the briefs, where the gentleman had a bird's nest blown into his face and he got ocular histoplasmosis from that. This is a repetitive trauma. This is a guy who's cleaning out those grain bins for almost 300 hours. It was 299-point-something hours over the course of a month. And after doing that, he starts having chest pain and he's coughing and he's having these other symptoms. He goes to the doctor. They go through this workup until they finally, in October, diagnose histoplasmosis. This is a repetitive trauma case. The Supreme Court has said in Duran that the manifestation for repetitive trauma claims can be multiple different dates. It could be the date of first treatment. It could be the date that they first had symptoms. It can be the date that the diagnosis is clear and its relationship to the employment is clear. It could be the date that they stopped working. If you go further into the Peoria County Bellwood Nursing Home case, that case specifically says data manifestation does not actually have to arise during the time the person was employed. It can actually be a date after the employment is separated. In this case, he stopped working. It's unclear on the record. It was either August 26th or 31st. I'm not sure which of those two days. But it's clear by the end of August he was no longer working there and exposed to it. He goes to the doctor in September. They suspect he has lung cancer. They schedule him for a biopsy. He testified during this time he knew something was wrong. He knew when he was at work and he was exposed to the dust that was making him cough and that was aggravating it. But he didn't understand what the actual problem was. He thought he had cancer. In fact, his doctors suggested to him that he had cancer. They did. They did. And so when he goes in for the biopsy, that's when they figure out he's got histoplasmosis. That's on October 4th, 2010. It's that day that they finally say, this is what your diagnosis is. And by the way, you get this being exposed to bird droppings. And that's the date he understood both the fact of his injury, histoplasmosis, and its connection to the employment. Exposure to bird droppings while cleaning out the grain bins. That's the date of accident that's alleged. That's an appropriate manifestation date under Durand and Bellwood. Can I ask you a question? Absolutely. When did he give notice? He gave notice originally when he stopped working at the end of August, so around September 1st. He first goes to the boss and says, I'm having health problems. I don't know what's going on. They think maybe I have cancer. I need time off. I can't work around the dust. I've got a bunch of appointments coming up. And that's agreed. Mark Hale testified to that. As soon as he found out about the biopsy results October 4th, he sent a text message to Mark Hale. Mark Hale doesn't recall getting a text message about that particular issue. He remembers other ones, but not that he was told he has histoplasmosis and things that's work-related. However, the application for adjustment of claims was sent November 9th, 2010. That's within 45 days of October 4th, 2010. So under 16. So your position has to be, even if the original notice, I have cancer, is not viewed as a defective notice, but really viewed as no notice at all, because he's telling the employer he's got something other than, that his filing of his application of adjustment of claim is sufficient notice and that satisfies the notice. Yes, that is accurate. And that's not even questioned. No. In fact, they concede that. In this one, if I was trying to claim that the accident was during the exposure, I might have a problem, and I'd be arguing, oh, it's defective notice, but there's no prejudice, and notice that he had a problem, although he didn't understand it's work-related, it's sufficient. But I don't need to do that. Not when the manifestation date's October 4th, and they agree that November 9th was the notice date from the application. Well, what you told him at the end of August was everything he knew. It was. He couldn't tell him something that he didn't know. That's correct. Absolutely. And we have other cases that are similar. One would think, in order to place the employer on notice, you've got to tell him what's wrong with you that's related to employment. I mean, if an employee goes to an employer and says, my left foot hurts and then files an application for adjustment of claim because there's something wrong with his right foot, one would hardly say there was any notice at all. That's correct. That's not even defective notice. So cancer and histoplasmosis are not the same thing. No. But we don't have to go down that road of defective notice. We've got absolute notice based on the manifestation date. And on manifestation date, it occurs to me that this lung disease or lung problem that he has is really no different than CWP. Many times it's not diagnosed until years after they leave the mines. And we've never held that that's not compensable. No. I mean, there's many, many cases of pulmonary exposure, mesothelioma, those sorts of conditions. They're the exact same thing. The only difference is, in this case, hopefully, you know, the ultimate effect is the histoplasmosis. Once it's treated, hopefully he'll have a better recovery than those. But when it comes to presentation of symptoms, needing medical treatment, and then going through this long, exhaustive workup, that's exactly what happened here. And it's completely understandable. Well, in this case, it was not filed under the Occupational Disease Act. It was not. You're correct. This has a very strict 45-day notice provision, but that's satisfied based on the manifestation date being the October 4th. Absolutely. I do have to concede, for your honors in reviewing this, we had asked for TTD benefits from October 27th, 2010 through March. However, in the record, there aren't actual medical notes taking him off work until the September 21st ER visit. And so I have to concede, since there's no supporting medical on that period of TTD, we'd be looking only from September 21st forward and additional treatment. Based on the fact that the manifestation date was October 4th, notice was clearly done within 45 days. Even though he was separated from employment, that doesn't mean there's no employer-employee relationship. And based on the fact that all three doctors clearly say, this guy's histoplasmosis is related to the exposure he had at work, and no evidence was presented, no testimony was presented by the respondent's witness to claim that he wasn't exposed to that stuff in the grain house. And he clearly testified, I was exposed to bird droppings, there were pigeons all over, there were rat feces, there were rats. Given this evidence in this record, you can't draw any other conclusion other than this is a compensable case. The commission simply got it wrong. This is interesting. Histoplasmosis is a, seems like both doctors, even reading the bad report, is a resolving condition. It can be when treated appropriately, yes. It's like an infection. It's a fungal infection. Yes. So a fungal infection generally can be resolved. And there may be no disablement. There may not be. However, since he had not, in this record, by the time of trial, reached maximum medical improvement, the question of whether there's any permanent residual effect is left open. This was tried under 19B. Obviously, that would be the subject of a subsequent hearing regarding nature and extent of the matter. But he may very well make a full recovery. We don't know based on what was presented at the time of trial. So we're really talking about compensation for temporary, maybe partial disability. TTD. Yes, TTD for the period he was off from September 21 through March of 11. Medical bills. The bills were all paid by public data. Of course, they've got a lien. And then a further hearing to address permanent partial disability thereafter. Okay. Unless you have any other questions. No, there are none. Thank you. Thank you. Thank you, Your Honors. Good morning. May it please the Court, Counsel. My name is Edward James Kavich. I'm here on behalf of the Defendant Ethelene Perry Central Collective. I, like Counsel, came in on this case after the case was litigated at the arbitration level. I didn't enter it at the time that it went up on appeal to the Commission and the Circuit Court. I think one thing is clear, and Counsel pointed out, and the Court certainly knows this, that all the issues that were presented today, or are discussed today, deal with the standard underdue of manifest weight of the evidence. And I think for the Court's purposes, the only question then should be, was there sufficient evidence to support the findings of the Commission and the Circuit Court? And I believe there were. Certainly, there's been a lot of discussion about the medical doctors in this case, and we had three opinions. We had Dr. Farah, Dr. Norris, and the IME Dr. Braunschweiz. I would point out, I think Justice Stewart talked about his report somewhat, and one thing that, and I'll cite to the record, with regards to Dr. Braunschweiz's report, he noted that the petitioner's condition was unremarkable, that he had a near-normal pulmonary function test, and that a majority of patients with histoplasmosis are either asymptomatic or have rapidly resolving, self-limiting disease requiring no treatment or follow-up. But where does he say that his condition is, that there's no causal connection? Well, I think, again, I... He doesn't express, he does not define that there was no causal connection. I think what he opines, Justice, is that, and again, citing the record, he mentions this term, it's usually associated with disappointment. But he goes on to say, and I think this is where the interpretation comes in, that the vast majority of these types of cases or organisms are soil-dwelling funguses, that riverbanks are favorite roosting sites, that when such sites are disturbed by construction activities, vast amounts of potentially infectious aerosols may be formed. Yet the onset is abrupt, consisting of fever, chills, and substernal chest discomfort, and a harsh, non-productive cough that develops along with headaches, arthralgias, and myalgias. But where does he say it's not connected with disappointment? Well, I think, again... He doesn't say that. He doesn't say that. He uses the term, probably... He says, probably true, that his current condition is usually connected with disappointment. I mean, of course, he uses other words in here. Usually that word doesn't fit, but I hear what you're saying. Let me ask you about this sentence. Quote, the organism is a soil-dwelling fungus that riverbanks are favorite roosting sites. Close quote. What does that mean? Well, Judge, I mean, Justice, again, that's a question of fact. And I think that's assessed at the commission level as a prior effect. I don't think it's the court's role to review or reassess the credibility of the witnesses and or to reject inferences that were made at the circuit court. Well, yeah, but otherwise you've got to look beyond the opinion and see what it's based on, right? That's correct. Okay. And when we're talking about making those decisions, is there sufficient reliable basis, okay, to make an inference? I mean, what is Dr. Brunson's role in this case? What's he doing? He's the independent med evaluator for the respondent to assess certain questions that are posed to him regarding causation. Would a fair reading say that, along with the other doctors, this is a resolving condition? I mean, if you would state that, I would state that yes. Well, Norris, I think, said that. I think Norris said something like that. Relatively benign. Yeah, well, that's what we're really talking about, doctor speak. But what Brunson's is giving looks to me like I pulled the book off of the shelf, and it's probably very true that if you're disturbing riverbanks or roosting sites that you let this into the air, and if you're exposed to it, you're more likely than not to come up with this fungal infection. What does it have to do with anything about a grain bed? Well, correct us as I think that's one of the points. I mean, one of the issues in this case that was raised at the commission was, you know, was there any evidence that this fungus was actually present in the grain beds or the corn? I mean, not only Dr. Brunson's, but their own, in one of the cases they cited, one of their own doctors talked about, you know, how histoplasmosis develops. There was no testimony or evidence that indicated that histoplasmosis develops on corn grain or in grain plants. Is there anything in the record from a medical perspective that histoplasmosis is exposure to bird droppings? Well, yes, there is. I mean, the prior case says that, doesn't he? Yes, it says that. Okay. And then there's testimony by, which arguably you don't need a medical opinion, this grain has this material in it. Well, I believe the only testimony to that effect was by the petitioner. Correct. And was there a finding the petitioner was unbelievable? Well, I think there was. I think the credibility was an issue at the commission, and I think they assessed it appropriately. Well, what did they say about the claimant's credibility? Did they say he was not believable? No, I think what the commission pointed out and the arbiter pointed out, certain things that, for instance, that the petitioner reported with regards to his symptoms, and I'll get to that point. He goes and treats initially with Dr. Norris, I think at the emergency room immediately after the accident, reports shortness of breath and some headaches and some, I think, tiredness. He then sees Dr. Norris later on the following day, I'm sorry, this is going to September, and reports the same symptoms. However, and this is in the record, prior to his employment as the respondent in early July, he sees a Dr. Kesho and reports similar symptoms of shortness of breath, headaches, pain, and tiredness. Then after he sees Dr. Norris and on the ER visit at Pontiac, he states that he had a history, a three-year history of these types of symptoms. And just as you look at the record, it wasn't actually, I think, until November that he gives a history to Dr. Norris about this exposure to bird feces. This is the first time it comes up in the records, right? Well, is there any, I mean, we're sort of sidestepping the issue. Who is Mr. Hyatt? Sorry, it's Manager. Okay. He did not contradict the claimant's testimony that bird droppings and pigeons were present in the grain bins, that he's cleaning out the grain bins. I mean, I don't know where this credibility issue comes in. And nobody seems to dispute what he does there, correct? Nobody seems to dispute there's bird droppings in there, correct? There's no specific testimony on either side that there were bird droppings present. I'm sorry, there was no specific testimony by the respondent that there were not bird droppings present. So you've got the claimant testifying to that. You've got Norris and Farah certainly supportive of the claimant's position with regard to the condition of histoplasmosis. And then you've got Brunchins who, at best, doesn't really help you. How is that not against the manifest weight of the evidence? I would also state, Justice, that there was no specific testimony by the petitioner that he specifically discussed his activities with the doctors. It doesn't come up in any testimony. How did they arrive at the diagnosis of histoplasmosis? They just defined it without any input from the claimant? Certainly the inference is that there was input from the claimant, Justice. But, again, we don't have the privilege of knowing specifically what he told the doctors. Dr. Farah wrote, quote, There is a significant history of exposure on the patient's occupational history. The patient was cleaning the dust out of grain elevators and was exposed to bird residue, and this is known to be a significant risk factor for histoplasmosis, close quote. And even Brunchin said, I don't remember the exact language, but it takes very little exposure to contract histoplasmosis. Again, I'm not... He gave them a history. That's correct. I'm not arguing that that's in the medical records, Justice. But, again, I think a totality of the evidence, and I think the court has to consider the fact that this person, the claimant was reporting symptoms before he even worked with him, and he didn't tell his doctors when he saw, initially, Farah and Norris, about this history prior to his employment at Prairie Central that he was having symptoms of shortness of breath and tiredness. Well, actually, Farah specifically, because he was diagnosed earlier with hypersomnia, and Farah specifically opined that the hypersomnia was unrelated to the diagnosis of histoplasmosis. So he must have known something about it. But, again, there were other symptoms. I mean, the diagnosis is there, but he was reporting symptoms of shortness of breath and tiredness and fatigue, which, again, are also symptoms that could be related to histoplasmosis, as I think Dr. Brunchin said in the other diagnosis. Well, if he had allergies. So if he has allergies before, does that mean he couldn't have contracted histoplasmosis in the claimant? Again, Justice, I think that's purely speculative. Well, that's sort of what you're doing. You're saying he had this condition, so maybe it was something before. Aren't you doing the same thing? No, Justice. Respectfully, I think what I'm pointing out is that he didn't give this history to the doctors after the alleged employment at Prairie Central. He didn't tell Dr. Norris initially or Dr. Farah. Specifically, then, that means what then? What conclusion do we draw from that, what you just said? What conclusion do we draw? I think it goes back to the credibility issue. And I think that the commission and this circuit court assessed that credibility and assessed it appropriately. The credibility on what issue? To what extent? Credibility on what issue? On his history and what he provided to his doctors. I mean, the problem is, during that time frame, he goes to the doctors. He's short of breath. He's got these problems. His chest hurts. They do some diagnostic testing, and they tell him, we think you might have cancer. There's not any reason for him to talk about bird droppings. Then they get the biopsy back, and they say it's histoplasmosis. That comes from bird droppings. That's when he's going to say, oh, I work in a grain bin. There are all kinds of bird droppings there. Why would he initially give that history to them that he worked around bird droppings when they're telling him he's probably got cancer? It all kind of makes sense to me. When it came up that it was histoplasmosis, then you put two and two together and realize what's going on. Just to start, again, reviewing the record, he had a discussion with Mark Heil early in September that he couldn't work. There was a discussion back and forth about whether he had cancer. But he did tell Mark Heil, by his doctor's recommendation, that he could not work in grain or grain dust. That was early September. If they think he's got lung cancer, aren't they going to tell him? Again, I think the point being that he had a discussion with his employer around that time about, obviously, there was some connection, or potentially some connection between what he's experiencing and working in grain. Are you saying that Heil should have realized there was a work connection when he talked about that, as far as notice goes? No, I think that a reasonable person should have known. If the employee is going to his employer and telling him, I can't work here because I think I'm sick from working here. Did he say he thought he was sick from working? Or did he say, I don't think I can work in the grain? I think his statement was that his doctors told him he could not work in the grain. Let me ask you the same question I asked your opponent on this manifestation. First of all, do you see any distinction in how we determine manifestation date in workers' compensation cases versus occupational disease cases? Is there any distinction as to the analysis? I would only address the, I understand the manifestation date in workman's comp cases, Your Honor, so do I think there's a distinction? For instance, many times in occupational disease cases, the manifestation date comes years after the employment ends. Is there any reason why it can't come years after the employment ends in a workers' comp case? No, only that if it's an occupational disease case or claim, the respondent or petitioner would file that. But my question was, is there any difference in the analysis of determining when the manifestation date is based on whether it's a workers' compensation case or an occupational disease case? Under barrier bail, likely not, no. You mean we perform the same analysis? Yes. Okay.  I don't believe so. Thank you, counsel. Counsel, you may reply. I just want to highlight on a couple things that the panel asked counsel. The issue of credibility and whether or not the commission found that the employee or the claimant was credible, they actually did. Keep in mind, the commission affirmed the arbitration decision, and within the arbitration decision, the arbitrator specifically found the following. Based on the foregoing, I find that while petitioner may have been exposed to histoplasmosis during his short period of seasonal work for the respondent, petitioner did not prove that his current condition of ill-being is clause-related. The arbitrator found he was credible in his testimony that he was, in fact, exposed to the bird droppings. And that finding was specifically affirmed by the commission. The commission, though, then went and said, but he's got to produce some other evidence. They said he didn't provide any evidence that histoplasmosis grows in or on stored corn or was present at his workplace. Well, yes, he did. He testified that it was there. And the respondent presented two witnesses, neither of which said no, bird droppings are nowhere in there. If you go through, and I wonder why the question wasn't asked of either of them, but if you go through their testimony, both of them testify that while the grain bins he was cleaning are used every year and they're cleaned out every year, that some of the material along the bottoms and the sides have been there for years. Six years, I believe it was. Yeah. And they ultimately, neither of them said, no, there aren't pigeons there, there isn't droppings there, there's not rats there. Neither of them said that. They could have easily done that. And if that question had been asked and Mark Henshaw or Mark Kyle said, no, that's not present in there, then that would be one piece of evidence the commission could have relied on to say he wasn't exposed. But without that being in there, the only evidence is his testimony that it was there. And they found that to be credible. The manifest rate on that issue, the only evidence, supports that he was exposed. Regarding medical opinions on causal connection and whether everything that was going on was really related to a prior condition, counsel is arguing that, and it's argued in the briefs, but there's no medical opinion that says his condition in September, October, November 2010 was related to something prior to the employment. If he wants to allege that, that's fine, but have a medical opinion that supports it. There's nothing in this record that says it. So it's not an argument the commission could have relied on in denying commensability in this case. Counsel also indicated that there's no history of an exposure in the records until November 2010. That's wrong. Specifically on October 22, 2010, Dr. Norris goes at length in describing what he understood the position or job to have been. Counsel said that there's no evidence showing what Norris or Farrah knew about the guy's job. Well, it says right here in the record, states that back in late July through end of August, was in a grain flat, transferring and cleaning the flat, the corn was six years old, and was the worst he has seen, lots of mold, bird droppings, tons of pigeons and sparrows in the flat, quote, all the time, end quote. That is the October 22, 2010 visit. It's very clear in this record that Dr. Norris and then later Dr. Farrah on November 9th knew exactly what this guy was doing for work and how he was exposed. So to claim that those opinions aren't credible because we don't know what information they had simply doesn't jive with what the records show. I ask that you reverse the commission in all of its findings, and find that there was an accident and it is compensable, and remand the matter to the commission for further findings. Thank you. Thank you, counsel, both for your arguments.